UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 24-01593-KK-AGRx** | Date: | April 6, 2026 |
|---|---|---|---|

| Title: | ***Christina N. v. City of San Bernardino et al.*** |
|---|---|

Present: The Honorable    KENLY KIYA KATO, UNITED STATES DISTRICT JUDGE

| Dominique Carr | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:**    **(In Chambers) Order Setting Forth Findings of Fact & Conclusions of Law**

**I.
INTRODUCTION**

On November 1, 2024, plaintiff Christina N. ("Plaintiff") filed the operative Second Amended Complaint ("SAC") against defendants City of San Bernardino ("City") and Sonny Aguilera ("Officer Aguilera") asserting various federal and state law claims arising from multiple alleged sexual assaults occurring in September and October of 2022. ECF Docket No. ("Dkt.") 24, SAC. On January 14, 2025, the Clerk entered default against Officer Aguilera. Dkt. 41.

Plaintiff and defendant City agreed to waive a jury and proceed by bench trial. Dkt. 92. A bench trial was held on December 1, 3, and 5, 2025, as to four causes of action against defendant City: negligence, sexual battery, false imprisonment, and violation of the Bane Act (Cal. Civ. Code § 52.1), in which Plaintiff asserted defendant City is vicariously liable. The Court then ordered the parties to submit proposed findings of fact and conclusions of law by January 26, 2026. Dkt. 113. Both parties timely filed their proposed findings and conclusions. See Dkt. 114 ("Def.'s Br."); Dkt. 116 ("Pl.'s Br.").

The Court, having considered all the evidence presented, the written submissions, and the argument of counsel, issues the following Findings of Fact and Conclusions of Law.

///

## II.
## <u>FINDINGS OF FACT</u>

**A.    THE DOMESTIC VIOLENCE CALL**

1.  Plaintiff first met Officer Aguilera on August 25, 2022, when he responded to her 911 call for help.

2.  At 1:13 a.m., Officer Aguilera arrived in a marked police car and in full police uniform at the Inland Center Mall parking lot in San Bernardino, California.  Officer Aguilera had a badge and was equipped with police-issued equipment, including handcuffs and a gun.

3.  Officer Aguilera spoke with Plaintiff, who appeared upset and scared.

4.  Officer Aguilera learned Plaintiff called 911 because her boyfriend, Kirby Larson ("Mr. Larson"), reacted violently after viewing an explicit video of Plaintiff performing oral sex on another man.

5.  Officer Aguilera told Plaintiff he was there to help her.

6.  As part of the official investigation, Officer Aguilera obtained Plaintiff's address and cell phone number.

7.  Plaintiff did not normally share her contact information with strangers and only shared such information with Officer Aguilera because he was the investigating police officer.  Plaintiff subsequently signed a confidential victim statement and specifically asked that her name and contact information be confidential.

8.  At 2:58 a.m., Officer Isaac Salas took Mr. Larson into custody and left Plaintiff at the scene with Officer Aguilera.

9.  Plaintiff was alone with Officer Aguilera for the next forty-five minutes.

10. Officer Aguilera turned off his body-worn camera while alone with Plaintiff and asked her questions about the explicit video.

11. Officer Aguilera, who was twenty-two years younger than Plaintiff, also asked what aged men Plaintiff was attracted to.

12. Plaintiff was uncomfortable talking with Officer Aguilera.

13. While still at the scene, Officer Aguilera sent an unsolicited text to Plaintiff, stating, "Hey, this is Sonny."

14. Plaintiff did not know Officer Aguilera by his first name and found it odd he would text her this.

15. Officer Aguilera left the scene at 3:43 a.m., followed Plaintiff home, and sent multiple unsolicited texts over the next few hours, to which Plaintiff never responded.

**B.      OFFICER AGUILERA REPEATEDLY TEXTS AND CALLS PLAINTIFF**

16. Officer Aguilera repeatedly texted and called Plaintiff in the days after the August 25, 2022 incident.  He even asked Plaintiff to "send pics" and if he could stop by her residence. Plaintiff routinely ignored these texts and calls.

**C.      THE SEPTEMBER 2, 2022 INCIDENT**

17. On September 2, 2022, Officer Aguilera texted Plaintiff multiple times asking where she was and stating he wanted to come by to talk.

18. After initially ignoring these texts, Plaintiff responded, "For?"

19. Officer Aguilera replied, "To come by and see you."

20. Plaintiff thought Officer Aguilera wanted to discuss the ongoing investigation and did not want to upset him, so she provided her location.

21. Officer Aguilera arrived at Plaintiff's location and texted her to come outside, and Plaintiff complied.

22. Plaintiff expected Officer Aguilera to be driving his marked police car, but he arrived in his personal vehicle.

23. Officer Aguilera told Plaintiff to enter his vehicle, and she complied.

24. Once inside the vehicle, Plaintiff saw a firearm in the pocket of the driver's door.  Officer Aguilera later admitted in an interview that he kept a second weapon in his personal vehicle.

25. Officer Aguilera first discussed the pending domestic violence case against Mr. Larson.

26. Then, Officer Aguilera took Plaintiff's cell phone without her consent and searched for the explicit video of Plaintiff performing oral sex.  Plaintiff initially believed he was doing so for investigatory purposes.

27. Plaintiff eventually became uncomfortable but did not say anything in order to avoid conflict with Officer Aguilera.

28. Plaintiff then asked for her phone back.  To increase the chance that Officer Aguilera would give it back, she told Officer Aguilera she had other videos where she was "livelier."

29. Instead of giving the phone back, Officer Aguilera pulled his pants down and said he wanted a demonstration of the sexual act in the video.

30. Out of fear, and to avoid upsetting Officer Aguilera, Plaintiff complied.

31. During the act, Officer Aguilera forcefully pressed her head down onto his erect penis.

32. Plaintiff complied because Officer Aguilera was a police officer.

33. Plaintiff exited the vehicle emotionally after Officer Aguilera was done. Plaintiff later learned Officer Aguilera had deleted all their text and call history from her phone without her consent.

## D.    PLAINTIFF'S EFFORTS IN REPORTING THE ENCOUNTER TO POLICE

34. The next day, on September 3, 2022, Plaintiff visited a City of San Bernardino police station to report Officer Aguilera's sexual misconduct.

35. Plaintiff asked to speak with a sergeant or the watch commander.

36. After telling a sergeant what happened, the sergeant dismissed Plaintiff and told her she could be arrested for making false reports.

37. Plaintiff left the police station after unsuccessfully reporting the incident.

38. For weeks, Officer Aguilera continued contacting Plaintiff. Plaintiff either ignored Officer Aguilera or sent short, canned responses.

39. Out of fear, Plaintiff returned to the City of San Bernardino police station and attempted to report Officer Aguilera again but encountered the same sergeant whom she spoke with on September 3, 2022. The sergeant dismissed her once more.

40. On October 19, 2022, Plaintiff filed a written complaint with the City of San Bernardino Police Department. The complaint described her encounter with Officer Aguilera and how she was denied the opportunity to file a complaint in person at the station.

41. Later that day, Plaintiff was interviewed by Detective Frank Fuentes and Sergeant Matthew Block. During the interview, Officer Aguilera texted and called Plaintiff multiple times, even texting Plaintiff to "send pics."

42. During the interview, Detective Fuentes and Sergeant Block also asked Plaintiff to answer an incoming call from Officer Aguilera. Plaintiff answered, put the call on speakerphone as directed, and Sergeant Block recognized Officer Aguilera's voice.

43. Officer Aguilera was on duty in a field training officer class when he called.

44. Plaintiff shared concerns about Officer Aguilera learning of the interview given he was still an active-duty police officer. She thus downplayed the extent of Officer Aguilera's abuse during the interview. For example, Plaintiff did not mention she saw a firearm while she was in Officer Aguilera's vehicle. However, Plaintiff did say she believed police officers always carried guns.

45. Detective Fuentes and Sergeant Block both reviewed Plaintiff's text messages to Officer Aguilera and concluded none of the texts were flirtatious.

46. At this point, there were ninety-six text messages and forty telephone calls from Officer Aguilera. Few of these conversations were initiated by Plaintiff with the exception of canned, non-flirtatious text message responses. Plaintiff never called Officer Aguilera.

**E.      THE OCTOBER 19, 2022 INCIDENT**

47. After the interview, Officer Aguilera continued to repeatedly text and call Plaintiff.

48. Later that day, and after the interview, Plaintiff answered one of Officer Aguilera's several phone calls and told him she would be at "Loma Vista" if he wanted to talk.

49. Officer Aguilera drove to Loma Vista and saw Plaintiff in her vehicle outside her friend's apartment building waiting for a parking spot. Officer Aguilera then met with Plaintiff and invited himself to join Plaintiff at her friend's apartment. Plaintiff met with him because she was afraid Officer Aguilera learned of the interview with Detective Fuentes and Sergeant Block and did not want to upset him.

50. Officer Aguilera then parked his vehicle in a fire lane in front of the apartment complex. When confronted by the apartment manager about his parking, Officer Aguilera flashed his badge and told the manager he was on "official business."

51. Upon entering the apartment, Officer Aguilera again demanded Plaintiff to perform oral sex on him. Plaintiff complied to avoid upsetting Officer Aguilera.

**F.      PLAINTIFF REPORTS OFFICER AGUILERA AGAIN**

52. The next morning, on October 20, 2022, Plaintiff reported the October 19, 2022 incident to Detective Fuentes.

53. Later that day, the City of San Bernardino Police Department's Professional Standards Bureau informed Officer Aguilera they wanted to interview him.

54. After being contacted for an interview, Officer Aguilera repeatedly called and texted Plaintiff, asking her to meet him. The two met later that day, and Officer Aguilera took Plaintiff's phone, deleted the text messages and call history between them, and asked Plaintiff to lie about what happened.

55. Plaintiff never received so many texts and calls from a male in her life.

56. If Officer Aguilera were not law enforcement, Plaintiff would have blocked his telephone number or sought a restraining order.

**G.      OFFICER AGUILERA'S INTERVIEW**

57. The Professional Standards Bureau interviewed Officer Aguilera on November 2, 2022.

58. Although he initially lied about his interactions with Plaintiff, Officer Aguilera eventually admitted to both incidents with Plaintiff and to deleting text messages and call history from Plaintiff's cell phone.

59. Officer Aguilera also admitted to violating the City of San Bernardino Police Department's policy against the "[u]nwelcome solicitation of a personal or sexual relationship while on duty or through the use of one's official capacity."

60. Officer Aguilera stated he targeted Plaintiff because she was "easy."

61. Officer Aguilera ultimately resigned, and the California Commission on Peace Officer Standards and Training rescinded his certifications.

## H.    DAMAGES[1]

### a.    Plaintiff's Testimony[2]

Plaintiff testified as follows:

62. Plaintiff felt violated when Officer Aguilera took her cell phone without her consent and began looking through her private photographs and videos.

63. Plaintiff felt uncomfortable and embarrassed when Officer Aguilera began watching the explicit video on her phone.

64. Plaintiff felt powerless during the sexual act demanded by Officer Aguilera on September 2, 2022.

65. Plaintiff was visibly upset, in shock, and needed to be calmed down after the September 2, 2022 incident.

66. Plaintiff felt Officer Aguilera's sexual acts were a personal and private violation because she believed those acts were "something reserved for a relationship [she's] been in for a long, long term or for [her] husband" – "not for somebody [she] just met."

67. Plaintiff was unable to sleep on September 2, 2022, and still has trouble sleeping due to nightmares, worry, and thoughts of helplessness.

---

[1] As for the testimony of Dr. Gregory Sayer that the Court did not strike during trial, the Court finds his testimony unreasonable, unreliable, and incredible. In particular, Dr. Sayer's testimony that Plaintiff suffered no damages as a result of Officer Aguiler's actions due to her "complicated life history" is both offensive and simply untenable. See Hastie v. Handeland, 274 Cal. App. 2d 599, 604 (1969) ("A tort feasor may be held responsible where the effect of his negligence is to aggravate a preexisting condition or disease.").

[2] Notably, Officer Aguilera did not testify at trial. Hence, the only testimony regarding the interactions between Officer Aguilera and Plaintiff was Plaintiff's which, as stated above, the Court finds reasonable and credible.

68. Plaintiff felt scared, unsafe, and helpless when Officer Aguilera continued to call and text her after September 2, 2022.

69. Plaintiff has been afraid to live alone since the September 2, 2022 and October 19, 2022 incidents, and her children have moved in with her.  Before her children moved in, Plaintiff would plant traps in her home and would push her couch up against the front door for protection.

70. Plaintiff fears law enforcement as a result of the September 2, 2022 and October 19, 2022 incidents and avoids them whenever possible.

71. Plaintiff is also fearful of men generally.  Officer Aguilera's sexual acts have dramatically affected her ability to be intimate with a man, and her sex life is now nonexistent.

72. Plaintiff has had thoughts of self-harm since the incidents with Officer Aguilera and is no longer an extroverted person.

73. The Court finds Plaintiff's testimony, including her testimony as to the events and her resulting damages, reasonable and credible.

### b. Dr. Nolan's Testimony

74. The parties stipulated Dr. Jacqueline Nolan, a licensed psychologist, was qualified to testify as a medical expert.  Dr. Nolan testified as follows:

75. Plaintiff began receiving therapy from Dr. Nolan after the incidents with Officer Aguilera. Dr. Nolan conducted several psychological tests on Plaintiff, including the Minnesota Multiphasic Personality Inventory-3, the Clinician-Administered Post-Traumatic Stress Disorder ("PTSD") Scale, and the Miller Forensic Assessment of Symptoms Test.  Dr. Nolan provided testimony that was grounded in the criteria set forth in the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders.

76. Dr. Nolan diagnosed Plaintiff with PTSD to a reasonable degree of medical probability and further opined Plaintiff's PTSD is permanent.

77. Officer Aguilar's sexual conduct directly caused Plaintiff's PTSD.  In particular, his sexual misconduct caused Plaintiff to have intrusive memories of the assaults, recurrent nightmares, and pronounced avoidance behaviors, such as fear, anger, sadness, extreme distrust, emotional detachment, and an inability to experience positive emotions.  Plaintiff also became hypervigilant, easily distracted, and socially isolated.

78. Plaintiff's PTSD is heightened by the interpersonal nature of the assault, Officer Aguilera's status as a police officer, and defendant City's dismissive responses to her repeated attempts to report the incidents.

79. Dr. Nolan also diagnosed Plaintiff with bipolar disorder.  Bipolar disorder intensifies her PTSD symptoms due to mood instability and psychiatric decompensation.

80. Plaintiff did not exaggerate, feign, or malinger any of her symptoms.

81. The Court finds Dr. Nolan's testimony, including her testimony regarding Plaintiff's symptoms, diagnosis and damages, reasonable and credible.

### III.
### CONCLUSIONS OF LAW

1. The Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

2. Venue is proper in this Court under 28 U.S.C. § 1391(b) because the events giving rise to Plaintiff's claims occurred in this judicial district.

3. Plaintiff asserts four state law claims: negligence against defendant City, sexual battery against all defendants, false imprisonment against all defendants, and violation of the Bane Act against all defendants.

### A.    NEGLIGENCE

4. To prove negligence, "the plaintiff must show that the 'defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury.'" Brown v. USA Taekwondo, 11 Cal. 5th 204, 213 (2021) (quoting Nally v. Grace Cmty. Church, 47 Cal. 3d 278, 292 (1988)).

5. *Duty.* "The default rule of tort law in California is that 'each person has a duty to act with reasonable care under the circumstances.'" Musgrove v. Silver, 82 Cal. App. 5th 694, 705 (2022) (quoting Regents of Univ. of Cal. v. Superior Ct., 4 Cal. 5th 607, 619 (2018)). "A person does not, by becoming a police officer, insulate himself from any of the basic duties which everyone owes to other people." Williams v. State, 34 Cal. 3d 18, 24 n.3 (1983) (citation modified) (quoting Warren v. District of Columbia, 444 A.2d 1, 8 (D.C. App. 1981)). Rather, there is a general expectation that "officers [] obey the laws whether they are on duty or off duty." Cranston v. City of Richmond, 40 Cal. 3d 755, 770 n.13 (1985) (citation modified); cf. Spielbauer v. Cnty. of Santa Clara, 45 Cal. 4th 704, 725 (2009) ("In performing their official functions, government officers and employees owe unique duties of loyalty, trust, and candor . . . to the public at large.").

6. Here, Plaintiff has proved Officer Aguilera owed her a duty to act as a reasonable police officer.

7. *Breach.* "Breach occurs when the defendant's conduct falls below the standard of care." Janice H. v. 696 N. Robertson, LLC, 1 Cal. App. 5th 586, 597 (2016) (citing Merrill v. Navegar, Inc., 26 Cal. 4th 465, 500 (2001)).

8. Here, Plaintiff argues "Officer Aguilera breached his duty of care through a course of conduct that departed markedly from the standard of care expected of a reasonable peace officer interacting with a crime victim." Pl.'s Br. at 28. This includes "misus[ing] [] victim

contact information, disabling the body camera while alone with a victim, initiating and persisting in personal/sexual communications, and creating and escalating a coercive and unsafe encounter." Id. at 29.  The Court finds Plaintiff has proved Officer Aguilera breached his duty to act as a reasonable police officer by making sexual advances to Plaintiff, who Officer Aguilera knew had suffered domestic abuse.  Among other things, Officer Aguilera used Plaintiff's cell phone number for personal gain, asked Plaintiff to send him pictures, and called and texted Plaintiff repeatedly despite Plaintiff's obvious disinterest in him.

9.  *Injury.*  Plaintiff argues Officer Aguilera's actions caused her emotional harm.  "[T]o recover damages for emotional distress on a claim of negligence where there is no accompanying personal, physical injury, the plaintiff must show that the emotional distress was 'serious.'" Wong v. Jing, 189 Cal. App. 4th 1354, 1377 (2010) (quoting Molien v. Kaiser Found. Hosps., 27 Cal. 3d 916, 927-30 (1980)).  "[S]erious emotional distress may be found where a reasonable man, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case." Id. at 1377-78 (citation modified) (quoting Molien, 27 Cal. 3d at 928).

10.  Here, Plaintiff has proved she experienced serious emotional distress, such as sleep disruption, persistent fear and hypervigilance, changes in living arrangements for safety, loss of social functioning, fear of men and law enforcement, and the need for ongoing therapy.

11.  *Causation.*  "The element of causation requires there to be a connection between the defendant's breach and the plaintiff's injury." Law Firm of Fox & Fox v. Chase Bank, N.A., 95 Cal. App. 5th 182, 204 (2023) (citation modified) (quoting Coyle v. Historic Mission Inn Corp., 24 Cal. App. 5th 627, 645 (2018)).  "Causation exists where 'the defendant's breach of its duty to exercise ordinary care was a substantial factor in bringing about plaintiff's harm.'" Janice H., 1 Cal. App. 5th at 598 (quoting Ortega v. Kmart Corp., 26 Cal. 4th 1200, 1205 (2001)).  "The substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical." People v. ConAgra Grocery Prods. Co., 17 Cal. App. 5th 51, 102 (2017) (citation modified) (quoting Bockrath v. Aldrich Chem. Co., 21 Cal. 4th 71, 79 (1999)).  Even "a very minor force that does cause harm is a substantial factor." Id. (citation modified) (quoting Bockrath, 21 Cal. 4th at 79).

12.  Here, Plaintiff has proved Officer Aguilera's breach of duty was a substantial factor in causing Plaintiff's harm.  Officer Aguilera's unwanted and unsolicited interactions and breach of privacy, inflicted upon a known victim of domestic abuse, were a substantial factor in inflicting Plaintiff's emotional harm. See Bunch v. Hoffinger Indus., Inc., 123 Cal. App. 4th 1278, 1302 (2004) ("A plaintiff need [] establish . . . only that the defendant's conduct substantially contributed to the injury and the circumstances make it just to hold the defendant responsible for the consequences of the accident.").

13.  *Comparative Fault.*  The County argues Plaintiff and Mr. Larson are comparatively at fault for Plaintiff's injuries. Def.'s Br. at 43.  The "'comparative fault' doctrine is a flexible, commonsense concept, under which a jury properly may consider and evaluate the relative responsibility of various parties for an injury . . . in order to arrive at an 'equitable apportionment or allocation of loss.'" Agustin v. Golden Empire Transit Dist., 116 Cal.

App. 5th 426, 450 (2025) (citation modified) (quoting <u>Knight v. Jewett</u>, 3 Cal. 4th 296, 314 (1992)). "Generally, a defendant has the burden of establishing that some nonzero percentage of fault is properly attributed to the plaintiff, other defendants, or nonparties to the action." <u>Phipps v. Copeland Corp.</u>, 64 Cal. App. 5th 319, 332 (2021) (citation modified) (quoting <u>Pfeifer v. John Crane, Inc.</u>, 220 Cal. App. 4th 1270, 1285 (2013)).

14. As an initial matter, this affirmative defense was not raised in defendant City's Answer or trial briefings. <u>See</u> Dkt. 25 at 11-16; Dkt. 72 at 8-9. Affirmative defenses are "waived in this circuit if [they are] not asserted before or at trial." <u>United States v. DeTar</u>, 832 F.2d 1110, 1114 (9th Cir. 1987); <u>see also</u> <u>KST Data, Inc. v. DXC Tech. Co.</u>, 980 F.3d 709, 714 (9th Cir. 2020) ("Generally, an affirmative defense that is not asserted in an answer to the complaint is waived or forfeited by the defendant." (citing <u>John R. Sand & Gravel Co. v. United States</u>, 552 U.S. 130, 133 (2008))). Hence, defendant City's comparative fault defense is waived.

15. Additionally, on the merits, the Court finds defendant City fails to meet its burden of establishing Plaintiff or Mr. Larson are comparatively at fault for the damage inflicted by Officer Aguilera. While Plaintiff may have suffered other emotional distress as a result of independent trauma, i.e., trauma inflicted by Mr. Larson, the damage resulting from Officer Aguilera's actions are solely the result of his negligence. Moreover, the Court is neither convinced nor pleased at defendant City's attempt to blame Plaintiff for the harm inflicted by Officer Aguilera. <u>See</u> <u>People v. Garza</u>, No. E044237, 2009 WL 190850, at *6 (Cal. Ct. App. Jan. 28, 2009) (rejecting defendant's argument that the sexual assault victim "was not scared" based on her actions as "a classic case of blaming the victim"); <u>cf.</u> <u>People v. Ramirez</u>, 55 Cal. App. 4th 47, 53 (1997) ("There is no other crime in which the victim risks being blamed and in so insidious a way[.]"); <u>Bloch v. Ribar</u>, 156 F.3d 673, 685 (6th Cir. 1998) ("[A] historic social stigma has attached to victims of sexual violence. In particular, a tradition of 'blaming the victim' of sexual violence sets these victims apart from those of other violent crimes.").

16. Accordingly, Plaintiff has proved by a preponderance of the evidence that Officer Aguilera was negligent and is entitled to judgment in her favor on this claim.

## B.    SEXUAL BATTERY

17. To prove sexual battery, Plaintiff must prove Officer Aguilera (1) "inten[ded] to cause a harmful or offensive contact with [Plaintiff] by use of [his] intimate part" and (2) made "sexually offensive contact with [Plaintiff] directly or indirectly." Cal. Civ. Code § 1708.5(a)(2). Plaintiff must also prove she "did not consent to the contact." <u>Angie M. v. Superior Ct.</u>, 37 Cal. App. 4th 1217, 1225 (1995).

18. Here, Plaintiff has proved each element of sexual battery.

19. *Intent*. Plaintiff has proved Officer Aguilera intended to make sexually offensive contact with her. On September 2, 2022, while in the car with Plaintiff, Officer Aguilera told Plaintiff he wanted a demonstration of the sexual act she performed in the video and pulled down his shorts. On October 19, 2022, Officer Aguilera again demanded Plaintiff perform a sexual act on him. This is sufficient evidence to show Officer Aguilera acted with the "purpose of

sexual arousal, gratification, or abuse." Roe v. Centinela Valley Union High Sch. Dist., No. B311456, 2022 WL 4285177, at *8 (Cal. Ct. App. Sep. 16, 2022).

20. *Sexually Offensive Contact.* Plaintiff has proved Officer Aguilera directly made sexually offensive contact by use of his penis when she performed oral sex on him. "Offensive contact" is "contact that offends a reasonable sense of personal dignity." Cal. Civ. Code § 1708.5(d)(2). Such sexual contact was unquestionably offensive given Plaintiff had no relationship with Officer Aguilera outside of her contact with him as a law enforcement official, Plaintiff had expressed no interest in a sexual relationship with Officer Aguilera, and Officer Aguilera knew Plaintiff had been domestically abused by Mr. Larson. The Court finds this conduct "offends a reasonable sense of personal dignity." Cal. Civ. Code § 1708.5(d)(2).

21. Among other reasons, defendant City contends Plaintiff's claim fails because she did not prove Officer Aguilera "intended to cause her harm during the sexual encounters." Def.'s Br. at 44 (emphasis added). Defendant City's argument is legally unfounded. Plaintiff must only prove Officer Aguilera intended "to cause a harmful or offensive contact." Cal. Civ. Code § 1708.5(a)(1)-(2) (emphasis added). Here, she has done so.

22. *Consent.* Consent is "objective," and thus, one's "words or acts or even [their] inaction may manifest a consent that will justify the other in acting in reliance upon them." Liranzo v. Liranzo, No. A109338, 2006 WL 537873, at *4 (Cal. Ct. App. Mar. 6, 2006) (citation modified) (quoting Restatement (Second) of Torts § 892, com. c, at 263 (A.L.I. 1979)). Such consent, however, is "not effective" if given under "duress." Lucas v. Redig, No. C035529, 2004 WL 1700517, at *8 (Cal. Ct. App. July 30, 2004) (citation modified) (quoting Restatement (Second) of Torts § 892B(3)). "Age, sex, mental capacity, the relation of the parties and antecedent circumstances all may be significant" in assessing whether duress exists. Id. (citation modified) (quoting Restatement (Second) of Torts § 892B, com. j, at 375-76).

23. Here, the Court finds Plaintiff did not consent to either sexual encounter with Officer Aguilera. As noted above, on September 2, 2022, Officer Aguilera approached Plaintiff with the pretense that he would discuss Mr. Larson's ongoing investigation. This was one day after the reported incident, and Plaintiff only knew Officer Aguilera as an officer. Further, Plaintiff testified she saw Officer Aguilera's personal firearm in his vehicle, that Officer Aguilera pulled down his pants and said he wanted a live demonstration, and that she felt "powerless" in the end. Similarly, during the October 19, 2022 incident, Officer Aguilera flashed his badge at the apartment manager and told him he was there for "official business" as he walked to the apartment. From these facts, Plaintiff thus had a credible fear in both situations that, from Officer Aguilera's known "position of authority," there was "an implied threat of hardship or retribution if [Plaintiff] refused to cooperate." People v. King, 183 Cal. App. 4th 1281, 1321-22 (2010). Ultimately, the evidence supports finding Plaintiff "complied because she was afraid and felt she had no choice." Id. at 1322.

24. Accordingly, Plaintiff has proved by a preponderance of the evidence that Officer Aguilera committed sexual battery.

## C.    FALSE IMPRISONMENT

25. To prove false imprisonment, the plaintiff must show they were "wrongfully deprived of his or her freedom to leave a particular place by the conduct of another." Doe v. Kachru, 115 Cal. App. 5th 175, 215 (2025) (citation modified) (quoting Schanafelt v. Seaboard Fin. Co., 108 Cal. App. 2d 420, 422-23 (1951)). The elements for this tort are "(1) the nonconsensual and intentional confinement of a person, (2) without lawful privilege, (3) for an appreciable length of time, however short." Id. (citing Fermino v. Fedco, Inc., 7 Cal. 4th 701, 715 (1994)).

26. Here, Plaintiff has proved each element of false imprisonment.

27. *Nonconsensual & Intentional Confinement.* Here, Plaintiff has proved Officer Aguilera intentionally confined her without consent. While Plaintiff may have been "theoretically free to depart at any time" from Officer Aguilera's vehicle or her friend's apartment, Molko v. Holy Spirit Ass'n, 46 Cal. 3d 1092, 1123 (1988), the Court finds Officer Aguilera falsely imprisoned Plaintiff by "fraud, deceit[,] or unreasonable duress," Scofield v. Critical Air Med., Inc., 45 Cal. App. 4th 990, 1002 (1996). In both encounters, Officer Aguilera knew Plaintiff was aware he was not only a police officer, but the officer who was investigating her domestic violence case against Mr. Larson. "Police officers occupy a unique position of trust in our society," Mary M. v. City of Los Angeles, 54 Cal. 3d 202, 206 (1991), and their presence can be "inherently coercive" in certain situations, Cornell v. City & Cnty. of San Francisco, 17 Cal. App. 5th 766, 800 (2017). For both encounters, the Court finds Officer Aguilera intentionally confined Plaintiff by using his inherent authority as a known officer involved in investigating Plaintiff's case. In particular, by telling Plaintiff he wanted "[t]o come by and see [Plaintiff]," one can reasonably infer Officer Aguilera was deceitfully implying he wanted to see Plaintiff for reasons relating to the investigation, particularly because Plaintiff had only come to know and interact with Officer Aguilera due to his position as a police officer. Further, by taking Plaintiff's phone without her consent, one can reasonably infer Officer Aguilera placed Plaintiff under duress while she was in his vehicle. As for the second encounter, Officer Aguilera flashed his badge, explicitly stated he was at the apartment for "official business," and told Plaintiff she was "on the hook" to perform a sexual act for him. It is thus reasonable to infer that Officer Aguilera intentionally confined Plaintiff again by acts of deceit or unreasonable duress by exploiting his position of trust as an officer.

28. *Without Lawful Privilege.* Plaintiff has proved she was not confined under lawful privilege, as Officer Aguilera was not arresting Plaintiff, nor does any evidence suggest Officer Aguilera had some other privilege justifying Plaintiff's imprisonment. See Fermino, 7 Cal. 4th at 716 (involving merchant rule privileging detention of customers); Easton v. Sutter Coast Hosp., 80 Cal. App. 4th 485, 496 (2000) (involving hospital-patient statute which "permits a local law enforcement officer to take an endangered adult into temporary [custody]"); Hanni v. Am. Airlines, Inc., No. C 08-00732 CW, 2010 WL 1576435, at *4 (N.D. Cal. Apr. 19, 2010) (involving a "pilots broad authority over passengers and the operation of an aircraft" under federal law).

29. *Appreciable Length of Time.* Plaintiff has proved Officer Aguilera imprisoned her for an appreciable period; that is, a period "long enough" for her to suffer a "real" restraint.

People v. Fernandez, 26 Cal. App. 4th 710, 718 (1994) (citation modified).  Defendant City concedes Plaintiff was in Officer Aguilera's vehicle on September 2, 2022 for at least forty-five minutes.  See Fermino, 7 Cal. 4th at 715 ("That length of time can be as brief as 15 minutes.").  Additionally, Plaintiff was in the apartment with Officer Aguilera for a more than fleeting amount of time during which the second sexual assault occurred.  See People v. Gossett, No. B233971, 2013 WL 6620679, at *5 (Cal. Ct. App. Dec. 16, 2013) ("[E]ven two minutes . . . can be a sufficiently 'appreciable length of time' for a false imprisonment." (quoting Fermino, 7 Cal. 4th at 715)); Cardenas v. Am. Airlines, Inc., No. 17cv2513-GPC(JLB), 2019 WL 1469131, at *7 (S.D. Cal. Apr. 3, 2019) ("[T]he 15 minutes asserted in Fermino was not meant to set a floor." (citing Robles v. Agreserves, Inc., 158 F. Supp. 3d 952, 976-77 (E.D. Cal. 2016))).

30. Accordingly, Plaintiff has proved by a preponderance of the evidence that Officer Aguilera falsely imprisoned her.

## D.    BANE ACT

31. The Bane Act prohibits interference with constitutional rights "by threat, intimidation, or coercion."  Cal. Civ. Code § 52.1.  The Act "does not require that 'the offending 'threat, intimidation or coercion' be 'independent' from the constitutional violation alleged." Murchison v. Cnty. of Tehama, 69 Cal. App. 5th 867, 896 (2021) (citation modified) (quoting Cornell, 17 Cal. App. 5th at 800).  Rather, where a Fourth Amendment claim is properly pleaded and proved, "the egregiousness required by [the Act] is tested by whether the circumstances indicate the [] officer had a specific intent to violate the [plaintiff's Fourth Amendment right]."  Id. (citation modified) (quoting Cornell, 17 Cal. App. 5th at 801; see also B.B. v. Cnty. of Los Angeles, 25 Cal. App. 5th 115, 133 n.14 (2018) ("'[C]oercion is inherent' in an unreasonable [] search."), rev'd on other grounds sub nom., 10 Cal. 5th 1, 10 (2020).  Specific intent turns on (1) the right at issue being "clearly delineated and plainly applicable under the circumstances of the case," and (2) the officer "commit[ting] the act in question with the particular purpose of depriving the citizen victim of his enjoyment of the interests protected by that right[.]"  Murchison, 69 Cal. App. 5th at 896 (citation modified) (quoting Cornell, 17 Cal. App. 5th at 803).

32. Here, Plaintiff has proved each element.

33. *Constitutional Violations.*  Plaintiff identifies three rights that were violated: (1) the right to be free from warrantless searches and seizures of personal property; (2) the right to be free from false imprisonment; and (3) the right to bodily integrity and personal security.

a. *Search & Seizure of Plaintiff's Cell Phone.*  The Fourth Amendment guarantees freedom from "unreasonable searches and seizures."  U.S. Const. amend. IV.  Under this cornerstone right, "law enforcement must generally obtain a warrant based on probable cause before conducting a search [or seizure]," absent an exception.  United States v. Anderson, 101 F.4th 586, 591 (9th Cir. 2024) (citing Mitchell v. Wisconsin, 588 U.S. 840 (2019)).  Relevant here, "taking possession" of property constitutes a seizure, Torres v. Madrid, 592 U.S. 306, 311 (2021), and an officer's "review of a cell phone [is] a Fourth Amendment search requiring a warrant," Olson v. Cnty. of Grant, 127 F.4th 1193, 1199 (9th Cir. 2025) (citing Riley v. California, 573 U.S. 373, 378 (2014)).  In Riley, the Supreme Court concluded cell phone

searches require warrants after considering the pivotal role cell phones play in the ordinary person's private affairs. See 573 U.S. at 393-97 ("[Phones] contain[] a broad array of private information never found in a home in any [other] form."). Those concerns "apply with equal force" in Plaintiff's case, Olson, 127 F.4th at 1198, as she stored ultra-sensitive files on her phone that a person would never share with others. Officer Aguilera's review of Plaintiff's cell phone thus constituted a search and, given he had no warrant, violated Plaintiff's Fourth Amendment right.

b. *False Imprisonment.* False imprisonment is the "common law analog[]" to a "seizure[] without probable cause." Puente v. City of Phoenix, 123 F.4th 1035, 1052 (9th Cir. 2024) (citing Torres, 592 U.S. at 311); see also Cabrera v. City of Huntington Park, 159 F.3d 374, 380 (9th Cir. 1998) ("To prevail on his [] claim for false arrest and imprisonment, [the plaintiff] would have to demonstrate that there was no probable cause to arrest him."). A "seizure" occurs when an officer makes a "'show of authority' that 'in some way restrain[s] the liberty' of the person." Torres, 592 U.S. at 311 (quoting Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968)). In this case, Officer Aguilera seized Plaintiff without probable cause when he restrained her liberty while in his vehicle on September 2, 2022, and in the apartment on October 19, 2022. Thus, the Court finds Officer Aguilera violated Plaintiff's Fourth Amendment right to be free from a seizure unsupported by probable cause.

c. *Right to Bodily Integrity.*[3] "Sexual misconduct by a police officer" implicates "the Fourteenth Amendment['s] [Due Process Clause]." Fontana v. Haskin, 262 F.3d 871, 882 (9th Cir. 2001); accord United States v. Gonzalez, 533 F.3d 1057, 1064 (9th Cir. 2008) ("Included in the liberty protected by the Fourteenth Amendment is the concept of personal bodily integrity and specifically 'the right to be free from certain sexually motivated physical assaults and coerced sexual battery.'" (quoting United States v. Lanier, 520 U.S. 259, 262 (1997))); see also Union Pac. Ry. Co. v. Botsford, 141 U.S. 250, 251 (1891) ("The right to one's person may be said to be a right of complete immunity; to be let alone."). Conduct violates substantive due process when it "is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Vazquez v. Cnty. of Kern, 949 F.3d 1153, 1162 (9th Cir. 2020) (citation modified) (quoting Fontana, 262 F.3d at 882 n.7). Under the evidence presented, the Court easily finds Officer Aguilera's deplorable conduct shocked the conscience and deprived Plaintiff's right to bodily integrity. See Fontana, 262 F.3d at 880-81 (concluding the plaintiff stated a bodily integrity claim where "she was helpless, . . . frightened, and [] in a vulnerable position," and the officer "abuse[d] [his] power" by engaging "in unreasonable, non-consensual, inappropriate touching and propositioning"); Vazquez, 949 F.3d at 1163 (same where the defendant made inappropriate sexual comments, touched the plaintiff without consent, was significantly older, "larger," "wore a uniform," and "had the power to discipline her"); see also Hess, 72 F.4th at 766 ("Sexual assault invades bodily integrity and cannot serve a governmental purpose. An officer's sexual assault while acting under color of law is conscience-shocking.").

---

[3] Plaintiff also refers to this as the right to personal security. The two terms are interchangeable. See Hess v. Garcia, 72 F.4th 753, 765 (7th Cir. 2023) ("The right to bodily integrity (also referred to as 'personal security') has long been recognized in law, including by Blackstone, who traced the right to the Magna Carta." (citing 1 William Blackstone, Commentaries 123-25)).

34. Defendant City suggests Officer Aguilera could not have "conducted an unreasonable search [or] seizure" because he "was not acting as the government, or an agent of the government." See Def.'s Br. at 47. The Fourth Amendment indeed "shields society" only from state action. Chandler v. Miller, 520 U.S. 305, 322 (1997); see also United States v. Phillips, 32 F.4th 865, 872 (9th Cir. 2022) ("If there is no state action, there is no Fourth Amendment violation."). It is axiomatic, however, that an "individual [who] possesse[s] [] state authority and purports to act under that authority" is a state actor. Griffin v. Maryland, 378 U.S. 130, 135 (1964). As explained in several parts of this Order, Officer Aguilera indisputably possessed state authority and abused such authority in sexually assaulting Plaintiff. See United States v. Classic, 313 U.S. 299, 326 (1941) ("Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is [state] action."). Among other things, Officer Aguilera was only able to meet Plaintiff due to his position as a police officer when he responded to her 911 call. Following that initial meeting, he took information that Plaintiff had provided for purposes of the police investigation and misused it to continue interacting with Plaintiff. Notably, many of the communications, including the phone calls made while Detective Fuentes and Sergeant Block were interviewing Plaintiff, were made while Officer Aguilera was, in fact, on duty as a police officer. Critically, Plaintiff clearly testified that she would not have continued her interactions but felt compelled to do so because she thought Officer Aguilera was continuing his investigation and because of his position as a law enforcement official. On September 2, 2022, Officer Aguilera asked questions concerning the investigation prior to assaulting Plaintiff and had a visible firearm in his vehicle. On October 19, 2022, Officer Aguilera also had visible "insignia of office," Torres, 592 U.S. at 315, including his badge, and even announced that he was on "official business." Under these circumstances, Plaintiff has proved Officer Aguilera possessed state authority and purported to act under that authority.

35. *Clearly Delineated & Plainly Applicable.* A right is "clearly delineated and plainly applicable" where "there is nothing vague or novel about [it] under the circumstances of [the] case." Cornell, 17 Cal. App. 5th at 803. In other words, it must not be "legally unclear" as to whether the right at issue was violated. Sandoval v. Cnty. of Sonoma, 912 F.3d 509, 520 (9th Cir. 2018). This standard is "nowhere as exacting as the clearly established law requirement under [42 U.S.C.] § 1983." Rodriguez v. Cnty. of Los Angeles, 654 F. Supp. 3d 1029, 1054 (C.D. Cal. 2023).

36. Each of Plaintiff's constitutional rights was clearly delineated and plainly applicable. First, Riley clearly delineated in 2014 that an officer may not search a person's cell phone without a warrant. 573 U.S. at 403 (concluding that police "must . . . get a warrant" before "searching a cell phone"). That prohibition plainly applies to Officer Aguilera searching Plaintiff's phone without a search warrant. Second, as recognized in Cornell, "there is nothing vague or novel" about the "constitutional right to be free from arrest without probable cause." 17 Cal. App. 5th at 803. Third, the Fourteenth Amendment's bar on state-sanctioned sexual assault is "obvious," Vazquez, 949 F.3d at 1166, and conduct that violates this right is "malum in se," Fontana, 262 F.3d at 882 n.8 ("No reasonable officer could believe that this conduct did not violate [the plaintiff's] constitutional rights."); see also Vazquez, 949 F.3d at 1165 (quoting Fontana, 262 F.3d at 882 n.8).

37. *Particular Purpose.* The Bane Act does not require direct evidence of an officer's intent to violate one's civil rights. See Murchison, 69 Cal. App. 5th at 897 ("[W]hether the [] officers

understood they were acting unlawfully [is] not a requirement." (citation modified) (quoting Cornell, 17 Cal. App. 5th at 804)).  Rather, evidence of a "[r]eckless disregard of the 'right at issue' is all that [is] necessary."  Id. (citation modified) (quoting Cornell, 17 Cal. App. 5th at 804).  Consistent with the Court's earlier sexual battery conclusion, Officer Aguilera acted with blatant disregard to Plaintiff's Fourth and Fourteenth Amendment rights while actively fiending for "sexual arousal, gratification, or abuse."  Roe, 2022 WL 4285177, at *8.

38. Accordingly, Plaintiff has proved by a preponderance of the evidence that Officer Aguilera violated the Bane Act.

## E.    VICARIOUS LIABILITY

39. Plaintiff seeks to hold defendant City liable under respondeat superior for all four claims.

40. Under California law, public entities may be held vicariously liable for the tortious acts and omissions of their employees under the doctrine of respondeat superior.  See Cal. Gov't Code § 815.2(a).

41. Such liability arises "only" where the public employee committed the tort while acting "in the scope of employment."  B.B., 10 Cal. 5th at 10 (quoting Diaz v. Carcamo, 51 Cal. 4th 1148, 1158 (2011)); accord Mary M., 54 Cal. 3d at 209 ("For the doctrine of respondeat superior to apply, the plaintiff must prove that the employee's tortious conduct was committed within the scope of employment.").

42. California courts use several tests in deciding whether an employee acted within the scope of their employment.  See Lisa M. v. Henry Mayo Newhall Mem'l Hosp., 12 Cal. 4th 291, 298-99 (1995).  Two are relevant here.  First, under the so-called "risk-focused test," an employee acts within the scope of employment when their "conduct is required by, engendered by, or an 'outgrowth' of [their] employment."  Musgrove, 82 Cal. App. 5th at 708 (quoting Lisa M., 12 Cal. 4th at 298).  Second, courts weigh the three rationales underlying respondeat superior: "(1) to prevent recurrence of the tortious conduct; (2) to give greater assurance of compensation for the victim; and (3) to ensure that the victim's losses will be equitably borne by those who benefit from the enterprise that gave rise to the injury."  Id. (quoting Mary M., 54 Cal. 3d at 209).

43. Under either test, it is clear "an employee's tortious acts may qualify as within the scope of employment" even if (1) "the employer did not authorize the employee's conduct," (2) "the employee acted without the motive of serving the employer's interest," or (3) "the employee engaged in intentional (or even criminal) conduct."  Id. (first citing Perez v. Van Groningen & Sons, Inc., 41 Cal. 3d 962, 969 (1986); and then citing Lisa M., 12 Cal. 4th at 296-97).

44. *Risk-Focused Test.*  The Court finds Officer Aguilera's "off-duty misconduct . . . may fairly be regarded as an outgrowth of his employment."  Juarez v. San Bernardino City Unified Sch. Dist., 106 Cal. App. 5th 1213, 1217 (2024).  As an initial matter, Officer Aguilera was only able to contact and communicate with Plaintiff because she provided him with her personal information during the initial service call.  Plaintiff testified she would not have provided such information otherwise.  Further, much of Officer Aguilera's phone and text communications with Plaintiff occurred while he was on duty.  This shows Officer

Aguilera's conduct "was not so attenuated that it would be unfair to allocate [Plaintiff's] losses to the [City] as an operating cost." Id. at 1228. Despite Officer Aguilera being off duty during the September 2, 2022 and October 19, 2022 sexual incidents, Plaintiff testified she felt forced to comply with Officer Aguilera's sexual demands given his position as a law enforcement officer. See id. at 1223 ("[W]hether [the officer] was off duty when he committed misconduct is [] not dispositive given the [] breadth of his off-duty authority."). Additionally, during each incident Officer Aguilera either had a visible firearm, flashed his badge, or self-identified himself as an officer. These are all "symbols of 'coercive power,'" id. at 1225 (quoting Mary M., 54 Cal. 3d at 216), and made Plaintiff reasonably believe Officer Aguilera "to be acting as a police officer," id. Moreover, the record supports finding Officer Aguilera was, in some fashion, acting as an officer by initially discussing the investigation while the two were in his vehicle. Thus, the Court finds Officer Aguilera's "conduct was 'broadly incidental' to his duties as a peace officer." Id. at 1227 (quoting Mary M., 54 Cal. 3d at 209); see also Mary M., 54 Cal. 3d at 218 ("Sexual assaults by police officers are fortunately uncommon; nevertheless, the risk of such tortious conduct is broadly incidental to the enterprise of law enforcement, and thus liability for such acts may appropriately be imposed on the employing public entity.").

45. *Policy Factors.* The Court also finds the policies underlying respondeat superior favor its application. First, "imposition of liability here would not be likely to cause public entities to take preventative measures that would impair the[ ]effectiveness of law enforcement activities." Mary M., 54 Cal. 3d at 214; see also Juarez, 106 Cal. App. 5th at 1227 ("Imposing liability incentivizes the [public entity] to guard against abuses of the broad authority it grants to its employee peace officers."). Second, "vicarious liability is an appropriate method to ensure that victims of police misconduct are compensated." Mary M., 54 Cal. 3d at 216. Finally, given the "extraordinary power and authority" officers have over everyday citizens, "[t]he cost resulting from misuse of that power should be borne by the community, because of the substantial benefits that the community derives from the lawful exercise of police power." Id. at 216-17. These policy issues are further implicated because Plaintiff attempted to report Officer Aguilera's misconduct on at least two occasions but was ignored by a sergeant employed by defendant City. The Court also notes the testimony from Detective Fuentes and Sergeant Block, both high-ranking officers employed by defendant City who apparently still believe the interaction between Plaintiff and Officer Aguilera was lawful and consensual. See, e.g., Dkt. 109 at 73:17-20 (Sergeant Block: "[Officer Aguilera] said that the relationship flourished – he didn't use the word 'flourished,' that's my word."). To maintain these positions when even Officer Aguilera admitted he violated the policy against the "[u]nwelcome solicitation of a personal or sexual relationship while on duty or through the use of one's official capacity" raises serious concerns regarding their credibility. Hence, policy factors – particularly as applied to defendant City – demonstrate respondeat superior liability is necessary to "prevent recurrence of [serious] tortious conduct," Mary M., 54 Cal. 3d at 214, like sexual assault by one of its sworn peace officers. See id. at 215 ("There is little or no risk that preventive measures would significantly interfere with the ability of police departments to enforce the law and to protect society from criminal acts.").

46. Accordingly, Plaintiff has proved by a preponderance of the evidence that defendant City may be held vicariously liable for Officer Aguilera's tortious conduct.

**F.    DAMAGES**

47.  Respondeat superior makes an employer liable, "irrespective of fault."  Diaz, 51 Cal. 4th at 1152.  "[T]he employer's share of liability for the plaintiff's damages corresponds to the share of fault that the jury allocates to the employee."  B.B., 10 Cal. 5th at 10 (citation modified) (quoting Diaz, 51 Cal. 4th at 1158).

48.  In California, non-economic damages are generally recoverable.  See Rubio v. CIA Wheel Grp., 63 Cal. App. 5th 82, 93 (2021) ("Noneconomic damages are recoverable in many actions . . . .").  Based on the record, Plaintiff is entitled to recover non-economic damages for past and future mental suffering, anxiety, humiliation, and emotional distress.  See L.A. Unified Sch. Dist. v. Superior Ct., 14 Cal. 5th 758, 784 (2023) ("[D]amages may, as appropriate, include compensation for mental suffering.").

**IV.**
**CONCLUSION**

In light of the Court's findings of fact and conclusions of law, no later than fourteen (14) days from the date of this Order, the parties shall confer and lodge a stipulation and proposed order addressing (1) the form, amount, and timing of Plaintiff's judgment to be entered consistent with this order; and (2) the scheduling for any other necessary post-judgment proceedings, including finalizing the default judgment against Officer Aguilera.  If the parties are unable to stipulate, they shall file separate proposed orders.


**IT IS SO ORDERED.**